J & R ELECTRIC DIVISION OF J. O. MORY STORES, INC., Plaintiff-Appellee, *v.* SKOOG CONSTRUCTION COMPANY, Defendant-Appellant.

Fourth District   No. 13535

Opinion filed June 3, 1976.

Francis J. Jahn, of Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, of Champaign, for appellant.

S. John Muller, of Charleston, for appellee.

Mr. JUSTICE GREEN delivered the opinion of the court:

J & R Electric Division of J. O. Mory Stores, Inc., sued defendant Skoog Construction Company, a corporation, in the Circuit Court of Coles County for balance due under a construction subcontract. The court, hearing the case without a jury, found in favor of the plaintiff and against the defendant and awarded damages in the sum of $23,384.11. Defendant appeals.

Community Unit School District No. 1, Coles County, Illinois, decided to undertake a building program known as the Charleston Shop and Ashmore Elementary School project. Plans and specifications were drawn and provided to certain prospective contractors, including defendant, and certain prospective subcontractors, including plaintiff. With reference to the work involved here, these documents provided that "the exterior unit switchgear for the Charleston High School Shop would be purchased by the owner" but that installation and final connection would be performed as part of the contract. Subsequently the project architects issued Addendum G-2, which provided that the contractor would assume the obligation of accepting a purchase order for the exterior unit switchgear at an agreed price of $9702 and thus furnish that equipment as a part of its obligation.

Defendant was the successful bidder on the project and accepted plaintiff's bid to perform the electric work under the contract. This work included the exterior unit switchgear. The evidence was disputed as to whether the plaintiff had knowledge of the issuance of Addendum G-2 at the time of making its bid. The trial court ruled, however, that regardless of whether plaintiff knew of the issuance of that document, the terms and

effective date of the subcontract were such that plaintiff undertook to perform the electric work as required by the general contract, of which Addendum G-2 was a part. Plaintiff does not argue to the contrary on appeal.

The parties also do not now dispute that defendant owes plaintiff at least $12,248.96. Principally in dispute is the sum of $9702, the purchase price of the exterior unit switchgear. Plaintiff paid the purchase price for the unit and installed it. Plaintiff contends, and the court found, that the subcontract was modified by the parties to provide that defendant would reimburse plaintiff for this purchase by a special payment over and above the amount defendant was otherwise required to pay by the terms of the subcontract. The modification is claimed to have arisen from a promise made by a letter written by defendant, directed and sent to plaintiff during the course of construction. That letter stated:

"We have looked into how the electrical switch gears should be billed and paid for for the subject project. On your next billing to us, which should be in our hands no later than October 10, 1972, please include the $9,702.00 billing for the exterior switch gear.

We shall include it in our request to the Owner which will be approved by the Board of Education on October 18, 1972, and we should receive a check from the School Board for the total request on either Friday, October 20, 1972, or Monday, October 23, 1972. We shall immediately send our check to you for the full amount of your payment request and then you can send your check on to Tepper Electric.

Please advise if the above would cause you difficulty.

We have been informed by telephone by Mr. John Scaggs of K. E. Unteed & Associates, that there is some cable which attaches to the bus duct and to the switchgear which has not been included by you in your quotation. It is the contention of Mr. Scaggs that this connecting material should have been in your quotation and that it is up to you to install.

His main point in his call was to make sure that the changeover is made on October 7, 8, and 9th and no other time and that there should be no delay in this changeover. Please see that this changeover is made and if there is some question about the connecting material, we can discuss it at a later date."

Defendant contends that the letter cannot be construed to contain a promise by defendant to make an additional payment for the exterior unit switchgear. The subcontract required that the subcontractor, in seeking monthly payments under the subcontract, advise the general contractor of the cost of "labor and materials incorporated in the work" during the month. Defendant contends that the only interpretation that can be given

to the letter is that defendant was telling plaintiff to include the exterior unit switchgear with the other "material incorporated in the work" in the monthly statement so that the plaintiff might receive his regular periodic payment under the terms of the subcontract. In view of the disposition we make of this case, we need not determine whether the judge's interpretation that the letter constituted a promise by defendant to pay for the unit is supported by the evidence.

■■ The court next ruled that plaintiff gave no consideration for defendant's promise contained in the letter. Plaintiff disputes this, contending that it gave consideration by making the changeover on the dates requested in the letter, October 7, 8, and 9. Under the subcontract, plaintiff, the subcontractor, agreed that defendant, the contractor, could determine when the work should be done. The performance by an obligor of a duty that it is already required to do is not consideration. (*Smith v. Gray,* 316 Ill. 488, 147 N.E. 459.) The trial court's ruling that plaintiff furnished no consideration for any promise attributed to defendant is amply supported by the evidence and correctly interprets the law.

The court then ruled that consideration was not necessary to make the promise enforceable because of section 2—209(1) of the Uniform Commercial Code, which provides: "[a]n agreement modifying a contract within this Article needs no consideration to be binding" (Ill. Rev. Stat. 1973, ch. 26, par. 2—209(1)). That section is part of article 2 on sales. Also in article 2 is section 2—106(1) which states:

> "In this Article unless the context otherwise requires 'contract' and 'agreement' are limited to those relating to the present or future sale of goods. 'Contract for sale' includes both a present sale of goods and a contract to sell goods at a future time. A 'sale' consists in the passing of title from the seller to the buyer for a price (Section 2—401). A 'present sale' means a sale which is accomplished by the making of the contract". Ill. Rev. Stat. 1973, ch. 26, par. 2—106(1).

No Illinois court of review has determined directly whether a contract or subcontract for the construction of buildings is a "contract for sale" within article 2. The decisions of other jurisdictions are split. For instance, in *Gateway Co. v. Charlotte Theatres, Inc.,* (1st Cir. 1961), 297 F.2d 483, decided under Massachusetts law, a contract to install air conditioning in a theater was held to be subject to article 2. On the other hand, in *Mingledorff's, Inc. v. Hicks* (1974), 133 Ga. App. 27, 209 S.E.2d 661, a similar contract for the installation of heating and air conditioning equipment was held not to be subject to article 2. Prior to the Uniform Commercial Code becoming effective on July 1, 1962, section 1 of the Uniform Sales Act provided:

"(1) A contract to sell goods is a contract whereby the seller agrees to transfer the property in goods to the buyer for a consideration called the price.

(2) A sale of goods is an agreement whereby the seller transfers the property in goods to a buyer for a consideration called the price." (Ill. Rev. Stat. 1961, ch. 121½, par. 1.)

Under the definition of the Uniform Sales Act, a contract for the manufacturing and installation of a steel marquee and canopy on the front of a building was held not to be one for the sale of goods. *Continental Illinois National Bank v. National Casket Co.*, 27 Ill. App. 2d 447, 169 N.E.2d 853.

■■ In *Vitromar Piece Dye Works v. Lawrence of London, Ltd.*, 119 Ill. App. 2d 301, 307, 256 N.E.2d 135, 138, the court stated that "Article 2 of the Uniform Commercial Code is basically a reenactment, modification and expansion of the Uniform Sales Act." As applied to the facts of this case we see no material difference between the definition of "contract for sale" set forth in section 2—106(1) of the Uniform Commercial Code and that of a "contract to sell goods" in section 1 of the Uniform Sales Act. The enactment of the Uniform Commercial Code provides no indication of any intention to negate the ruling in *National Casket Co.* and broaden the meaning of the phrase, a "contract to sell goods" to include a construction contract even though goods are thereby furnished and incorporated into a building. We, therefore, hold that the subcontract in question was not governed by article 2 of the Uniform Commercial Code and could not be modified by a promise for which no consideration was given. The award for $9702 must be set aside.

■■ Also in dispute is the sum of $1433.15, which was awarded as an additional cost of installing the switchgear. Under the original plans and specifications, plaintiff would not have been required to incur this cost. With Addendum G-2 incorporated into the contract, plaintiff was required to incur these costs without additional payment. The award of this item must also be set aside.

Since the $9702 and the $1433.15 items were improperly included in the award of damages, they must be deducted from the judgment. Accordingly, we reverse the judgment from which appeal is taken and remand the case to the Circuit Court of Coles County with instructions that the judgment be reduced by the sum of $11,135.15 to the sum of $12,248.96.

Reversed and remanded with directions.

CRAVEN, P. J., and SIMKINS, J., concur.